# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X

ALLIED MARINE SERVICES LTD.,                :
                                            :
                         Plaintiff,         :
                                            :    06 Civ. 3641 (LAK)(THK)
            -against-                       :
                                            :
LMJ INTERNATIONAL LTD.,                     :        **REPORT**
                                            :    **AND RECOMMENDATION**
                                            :
                         Defendant.         :
--------------------------------X

**FROM:   THEODORE H. KATZ, United States Magistrate Judge.**
**TO:     HON. LEWIS A. KAPLAN, United States District Judge.**

This is an admiralty action brought by Plaintiff Allied Marine
Services ("Allied") against Defendant LMJ International ("LMJ").
Currently before the Court are two motions: (1) Allied's Motion for
Recognition, Confirmation and Enforcement of Arbitral Award [Docket
#36], and (2) LMJ's Motion to Vacate Maritime Attachment brought on
behalf of two interested-party banks: ICICI Bank ("ICICI")[Docket
#52] and Bank of Baroda ("BOB") [Docket #57].

This suit was commenced when Allied filed a Complaint against
LMJ seeking a judgment confirming a London arbitration award
("Motion to Confirm"), and sought and received an Ex Parte Order
and Process of Marine Attachment ("Order of Attachment") against
the property of LMJ as it passed through the Southern District of
New York.  Pursuant to the Order of Attachment, Allied attached
electronically transmitted funds that were purported to be the
property of LMJ as they passed through intermediary banks located
in New York City.

1

LMJ then filed a Motion to Vacate the Order of Attachment, a Motion to Dismiss the Complaint, and a Motion for Countersecurity. LMJ's principle argument for vacating the Order of Attachment was that the arbitration proceeding, upon which the Order of Attachment rested, was invalid by virtue of an injunction issued by a court in Calcutta, India. The District Court (Hon. Lewis A. Kaplan, United States District Court Judge), at a hearing held on December 7, 2006, and in an Order issued on December 8, 2006 ("2006 Order"), rejected this argument by finding that the injunction is "entirely separable from the question of whether the suit [was] . . . brought on a valid prima facie admiralty claim." (Hearing Transcript, dated Dec. 7, 2006 ("2006 Hearing Tr.") at 24.) Finding Plaintiff's pleadings sufficient to state a valid prima facie admiralty claim, the District Court denied LMJ's motion.

LMJ also argued, among other things, that the Order of Attachment should be vacated because the attached property, Electronically Transferred Funds ("EFTs"), was not in the hands of LMJ's intermediary banks, and thus was not LMJ's attachable property.[1] The District Court rejected this argument because no

---

[1] During the December December 7 hearing, the District Court questioned LMJ's standing in light of its argument that it did not own the funds: "If they're your funds, then there is no problem with the attachment, and if they're not your funds, I'm not sure you have any right to complain about it." (2006 Hearing Tr. at 17). LMJ responded: "We would rather end up not [sic] being our funds . . . and we'd have the payee come in and make a claim."

2

other courts have distinguished between intermediary banks in the manner in which LMJ argued. (See 2006 Order).

Next, the District Court addressed LMJ's arguments for dismissing the Complaint. First, LMJ argued that the court should decline to hear the case on the grounds of comity. The District Court rejected that argument, finding no extraordinary circumstances. (See 2006 Hearing Tr. at 26.) Second, LMJ once again argued that the Complaint should be dismissed because the arbitration agreement was not valid. The District Court held that the record was inadequate for such a determination on a motion to dismiss. (See id. at 27.) Finally, the District Court reserved judgment on the countersecurity claim. (See id.)

After the 2006 Order was issued, LMJ sought to stay a decision on Allied's Motion to Confirm in light of the Second Circuit's decision to review on appeal two cases from the Southern District of New York which addressed the vacatur of orders of attachment. LMJ's motion to stay was denied in a second order issued by the District Court on June 27, 2007 ("2007 Order").

LMJ also brought the instant Motions to Vacate Maritime Attachment on behalf of both ICICI and BOB ("Motions to Vacate") as interested parties. ICICI challenges the validity of one attached EFT transaction and BOB challenges the validity of two attached EFT transactions.

All motions were referred to this Court for a Report and

3

Recommendation, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). For the reasons set forth below, the Court recommends that the Motion to Confirm be granted, and the Motions to Vacate be granted as to two of the challenged EFT transactions, but denied as to the third EFT transaction.

## BACKGROUND

### I.  The Allied-LMJ Charterparty[2]

LMJ is a large agricultural exporter based in India. (See Declaration of Ajit Kumar Patni, dated July 4, 2006 ("Patni Decl.") ¶ 2.) In September of 2003, LMJ chartered an Allied vessel, the MARYLAKI, to haul a cargo of wheat from the Indian port of Tuticorin to the United Arab Emirates ports of either Hamriyah or Sarjah, pursuant to a contract between LMJ and Emirates Grains Products LLC ("Emirates"). (See Patni Decl. ¶¶ 3, 6; Declaration of Sideris Fafalios, dated Feb. 27, 2007 ("Fafalios Decl.") ¶¶ 7-- 19.)

After concluding the charterparty negotiations, LMJ proceeded to load some of its wheat onto the MARYLAKI in Tuticorin.[3]

---

[2]  A "charterparty" is a contract by which a ship is leased by the owner to a merchant for the conveyance of goods on a predetermined voyage or for a specified period of time. See Blacks Law Dictionary, 251 (8th ed. 2004).

[3]  LMJ contests that the charterparty was fully concluded. More specifically, LMJ disputes the charterparty contained a provision permitting arbitration in London. However, as explained below, a London Arbitrator and an English High Court have concluded otherwise. For the purposes of this Report and Recommendation, the Court will assume that a valid charterparty

4

According to LMJ, while the wheat was being loaded, Emirates sought a discount on the price of the wheat; LMJ did not agree to discount the price. (See Patni Decl. ¶ 7.)  Immediately thereafter, the Master of the ship refused to allow the rest of the cargo to be loaded, claiming it contained too much contaminating debris. (See id.; Declaration of John Stuart Parkin, dated July 25, 2006 ("Parkin Decl.") ¶¶ 18-20.)  Eventually, the loaded wheat was unloaded. (See Patni Decl. ¶ 8.)  Allied then asked LMJ to either load acceptable wheat or the MARYLAKI would sail from port. (See Parkin Decl. ¶ 24.)  LMJ apparently did not respond. (See id. ¶ 25.)  Allied sent a final letter notifying LMJ that it considered the charterparty repudiated by LMJ; the ship then sailed. (See Exhibit ("Ex.") JSP2 Part B, at 48, annexed to Parkin Decl.)

II.  The London Arbitration

Allied subsequently sought arbitration in London to resolve its dispute with LMJ. (See Parkin Decl. ¶ 6; Ex. JSP1 Part A at 5, annexed to Parkin Decl.)  LMJ disputed whether the charterparty contained a valid arbitration agreement subjecting the dispute to London arbitration, and refused to appear in London. (See Parkin Decl. ¶ 32; Ex. JSP2 Part C at 90-91, 96, annexed to Parkin Decl.)  Allied, believing there was a valid arbitration agreement, submitted the dispute to arbitration in London, in November of 2003, by appointing Michael Scudder as its arbitrator

---

was entered into between Allied and LMJ.

("Arbitrator").    (See Parkin Decl. ¶ 6.)    LMJ was given an opportunity to appoint its own arbitrator, but denied the London arbitration was proper and refused to participate.    Instead, LMJ responded by going to the Indian High Court in Calcutta, where it obtained an injunction purporting to restrain Allied from proceeding with the London arbitration. (See Patni Decl. ¶ 10.) Allied nonetheless proceeded with the arbitration and received an award of $431,704.94 US Dollars together with interest, at a rate of 6.5% per annum compounded quarterly. (See Ex. JSP 1 Part C, "Final Arbitration Award," at 65-69, annexed to Parkin Decl. ("Arbitration Award").)

The Arbitrator also made the following findings: (1) that a valid charterparty was entered into by the parties and that it included a valid arbitration clause subjecting the charterparty to London Arbitration under English Law, and (2) that the Indian High Court injunction was not binding upon the Arbitrator. (See id. at 65.)    Allied then obtained an Order from an English High Court, granting it leave to enforce as a judgment, the Arbitration Award. (See Ex. JSP 2 Part C, at 88-89, "Order for Leave to Enforce as a Judgment," dated May 25, 2006 ("English High Court Order"), annexed to Parkin Decl.)    The English High Court Order gave Allied the ability to enforce the Arbitration Award as if it were a legal judgment or order. (See id.)    It also gave LMJ fourteen days to challenge the enforcement of the Order and to move to have it set

aside; but LMJ never brought such a challenge. (See id.; Parkin Decl. ¶ 30.)

## III. The Order of Attachment

In pursuit of the funds awarded in the Arbitration Award, Allied filed a Complaint in the Southern District of New York seeking a Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"). On May 12, 2006 the District Court issued an Ex Parte Order for Process of Maritime Attachment "against all tangible or intangible property belonging to, claimed by or being held for [LMJ] by any garnishees within this district, including but not limited to, American Express Bank . . . Bank of New York . . . [and] J.P. Morgan Chase." (Order of Attachment.) The District Court authorized the attachment of LMJ's property, up to the value of $631,611.25.

Pursuant to the Order of Attachment, Allied attached EFTs passing through New York City on three separate occasions. The first transaction was for $450,000, and was attached by JP Morgan Chase. The second transaction was for $108,000, and was attached by the Bank of New York. The third transaction was for $46,320 and was attached by American Express Bank. These three attachments are challenged in the motions currently before the Court.

LMJ moves on behalf of ICICI and BOB, as interested parties,

7

to vacate the Order of Attachment. Both banks argue that none of the funds attached were LMJ's property. Rather, they contend that because the arrested payments were made pursuant to financial instruments separate from LMJ's underlying contracts, the funds were not attachable property under the Order of Attachment. Allied argues that because the payments were made pursuant to LMJ's original underlying agreements, LMJ retained an attachable property interest in the funds.

As explained in more detail below, LMJ had no attachable property interest in the first two transactions and, therefore, the Order of Attachment should be vacated as to those funds. However, Allied has presented evidence that LMJ was the beneficiary of the third EFT and, therefore, had an attachable property interest in the EFT; accordingly, the Motion to Vacate Attachment should be denied as to those funds.

## DISCUSSION

### I. Maritime Attachment of Funds

The law of maritime attachment of property is grounded primarily in two federal rules for admiralty and maritime proceedings: Rule B and Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Rule B" and "Rule E" respectively). See Aqua Stoli Shipping, Ltd. v. Gardner Smith PTY, Ltd., 460 F.3d 434, 438 (2d Cir. 2006). Rule B provides a process by which a party may attach another party's assets. See id. A

8

proper maritime attachment requires the plaintiff to show: (1) it has met the filing requirements of Rules B and E; (2) it has a valid prima facie admiralty claim against the defendant; (3) the defendant cannot be found within the district; (4) the defendant's property can be found within the district; and (5) that there is no statutory or maritime law barring the attachment. See id. at 445.

Rule E(4)(f) provides the basic outline for the procedure to release property from attachment: "whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with theses rules." Fed. R. Civ. P. Supp. R.  E(4)(f); see also Aqua Stoli, 460 F.3d at 445 (listing other limited circumstances in which vacatur is appropriate).

ICICI and BOB, through LMJ, argue that Allied has not met its burden of showing, under Rule B, that the particular funds which have been attached are the property of LMJ, as opposed to ICICI and BOB.  In essence, they argue that if the funds are not the "the defendant's tangible or intangible personal property," as required by the plain language of Rule B, the funds cannot be attached.

Allied argues that the funds were sent, by EFT, to banks representing LMJ, pursuant to underlying agreements in which LMJ had a financial interest.   Therefore, Allied argues, LMJ's financial interest amounts to an attachable property interest in

9

the EFTs.  Allied further argues that under Second Circuit law, EFTs are attachable property when in transit through intermediary banks.

The parties present two issues to be resolved as to each transaction: first, whether LMJ had a property interest in the EFT; and second, if LMJ did have an interest in the EFT, whether it was an attachable property interest under Second Circuit law.  Because the underlying financial arrangement for each of the transactions is different, each transaction will be examined separately below.

II.  The Attachment of ICICI Funds by JP Morgan Chase

A.  The Underlying Agreements

In December of 2005, LMJ entered into an agreement with Cargill International Trading PTE Ltd. ("Cargill") whereby LMJ would export agricultural products to Cargill (the "Cargill-LMJ Agreement").  (See Ex. A annexed to the Declaration of Nitu Agarwal, dated July 7, 2007 ("Agarwal Decl.").)  The contract required Cargill to prepay the contract price of $10 million US Dollars.  (See id.)  In return, LMJ agreed to execute an "Export Advance Payment Guarantee" ("EAPG").  (See id.)  The EAPG assured Cargill that, if the contract was not performed, its $10 million prepayment would be returned with interest.  (See id.)  Under the terms of the Cargill-LMJ Agreement, LMJ was obligated to perform the contract and execute the EAPG.  (See id.)  Cargill was obligated to disburse the prepayment within seven days of issuance

of the EAPG.  (See id.)

ICICI is India's second-largest bank and counts LMJ as one of its customers.  (See Agarwal Decl. ¶ 6.)  On behalf of LMJ, ICICI issued an EAPG to Cargill (the "ICICI-Cargill EAPG").  (See Ex. B, annexed to Agarwal Decl.)  The ICICI-Cargill EAPG called for ICICI to pay Cargill $10 million US Dollars plus interest, not to exceed a total amount of $10,600,000, upon demand by Cargill.  (See id.)  More specifically, the ICICI-Cargill EAPG obligated ICICI "to pay to [Cargill] upon [Cargill's] demand . . . the [Cargill-LMJ] contract value or any part thereof which has become due."  (Id. ¶ 3.)  The ICICI-Cargill EAPG further defined ICICI's obligations, stating:

> [Cargill's] demand . . . shall be conclusive evidence of [ICICI's] liability to pay [Cargill] and of the amount of the sum or sums that [ICICI is] liable to pay [Cargill] hereunder and [ICICI] shall not be entitled to delay or withhold payment for any reason.

(Id. ¶ 6.)

On December 7, 2006, a year after execution of the Cargill-LMJ Agreement, LMJ notified ICICI bank that it would not perform the Cargill-LMJ Agreement.  (See Ex. C annexed to Agarwal Decl.)  On December 11, 2006, Cargill exercised its rights under the ICICI-Cargill EAPG and demanded the return of its $10 million dollar prepayment plus interest; ICICI then remitted $10,537,388.89 to Cargill.  (See Agarwal Decl. ¶ 9.)  Because the money was denominated in US Dollars, the request was sent to intermediary

11

banks located in the United States.  ICICI sent the money via EFT through ICICI's United States bank, J.P. Morgan Chase Bank ("JP Morgan"), located in New York City.  (See Ex. D annexed to Agarwal Decl.; Agarwal Decl.  ¶¶ 9-10.)

Pursuant to Allied's Order of Attachment, $450,000 of the EFT was attached by JP Morgan.  (See Ex. 1 annexed to Declaration of Patrick F. Lennon, dated Aug. 3, 2007 ("Lennon Decl.");[4] Agarwal Decl. ¶ 10.)  ICICI then made an  additional payment to Cargill of $450,000, to extinguish its liability under the ICICI-Cargill EAPG. (See Ex. E annexed to Agarwal Decl.; Agarwal Decl. ¶ 11.)  ICICI now argues that the $450,000 held by JP Morgan, belongs to ICICI and not LMJ, and thus the funds are not attachable property under Rule B.

B. Attachable Property Interests under Rule B

Rule B requires that the attached funds must be, at a minimum "the defendant's tangible or intangible personal property."  Fed. R. Civ. P. Supp. R. B(1)(a) (emphasis added); see also Chiquita Intern. Ltd. v. MV BOSSE, Nos. 07 Civ. 6786(PKL), 07 Civ. 7221(PKL), 2007 WL 2979632 at *3 (S.D.N.Y. Oct. 11, 2007) (noting that only a defendant's property may be attached); cf. Hamburg Bulk Carriers GMBH & Co. KG v. Proteinas y Oleicos S.A. de C.V., No. 04

_____

[4]  The copy of this exhibit, provided to the Court, has a circle drawn around what would have been the amount listed; however, the copy is blank inside the circle and unreadable.  The Court assumes that the document shows what it is purported to show – that $450,000 was attached by JP Morgan.

Civ. 6884, 2005 WL 1036127, *4 (S.D.N.Y May 4, 2005) (noting that although "[n]othing in the language of Rule B requires that the property attached be the exclusive property of the defendant," Rule B does apply to any property in which the defendant has an interest).   Thus, the plaintiff must show that the defendant has some discernible property interest in the attached funds before a court even reaches the issue of whether an EFT, arrested during transmission, is attachable. See Fed. R. Civ. P. Supp. R. E(4)(f) (putting the burden on the plaintiff to show why the attachment should not be vacated when the validity of an attachment is challenged); see also Aqua Stoli, 460 F.3d at 445 n.5 (holding plaintiffs have the burden to show that an attachment was properly ordered, but that defendants bear the burden to establish any equitable grounds for vacating the attachment).   Any other rule would permit a plaintiff to attach the funds of unrelated parties, and would undermine the goal of ensuring the defendant's appearance in a maritime action.   See Aqua Stoli, 460 F.3d at 437-38 (citing Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A., 339 U.S. 684, 693, 70 S. Ct. 861 (1950); see generally General Tankers Pte. Ltd. v. Kundan Rice Mills Ltd., 475 F. Supp. 2d 396, 399 (S.D.N.Y. 2007) (vacating attachment of funds because the funds belonged to an entity separate from the defendant).

When examining whether a defendant has an attachable property interest in EFTs, district courts have held that funds transferred

13

to a third party pursuant to a letter of credit are not attachable. See Primeshipping Co., Ltd. v. Wajilam Exports(s) PTE., Ltd., No. 06 Civ. 1183 (JSR), 2006 WL 1539330 at *2 (S.D.N.Y June 2, 2006). The reason for this conclusion is that a letter of credit "must be considered wholly apart from the underlying debt owed to [the defendant] . . . and from any contractual relationship between the negotiating bank and [the defendant]." Id. The most important feature of a letter of credit in this context is that "the issuing bank becomes obligated to pay upon presentation of adequate documents; no obligation runs with the goods themselves." Id. Thus, a letter of credit is entirely independent of the underlying debt associated with the sale of goods. See Alaska Textile Co. v. Chase Manhattan Bank, 982 F.2d 813, 815 (2d Cir. 1992); MSF Holding Ltd. v. Fiduciary Trust Co. Int'l., 435 F. Supp. 2d 285, 296 (S.D.N.Y. 2006).

When read together, Primeshipping, Chiquita International, and Hamburg Bulk Carriers stand for the proposition that, under Rule B, if a defendant does not retain at least some legal interest in attached EFTs, sent pursuant to an instrument such as a letter of credit, the attachment must be vacated. On the other hand, if the plaintiff can show that a defendant has retained some legal interest in the funds, the next step is to determine whether the attachment must be vacated pursuant to the holding in Aqua Stoli, which is the Second Circuit's most recent pronouncement as to the

vacature of orders of attachment. Compare Seamar Shipping Corp. v. Kremikovtzi Trade Ltd., 461 F. Supp. 2d 222 (S.D.N.Y. 2007) (leave to appeal granted, No. 06-5470 (2d Cir. Apr. 24, 2007)) (vacating attachment and finding that the defendant had no property interest in the attached EFT under New York State law) with Consub Delaware LLC., v. Schahin Engenharia Limitada, 476 F. Supp. 2d 305 (S.D.N.Y. 2007) (leave to appeal granted, No. 07-0833 (2d Cir. Apr. 3, 2007)) (upholding attachment because defendant originated EFT).

C.  The $450,000 held by JP Morgan

In the ICICI-Cargill transaction, in which $450,000 was attached by JP Morgan, ICICI initiated an EFT pursuant to an EAPG which, much like a letter of credit, obligated ICICI to pay Cargill unconditionally upon demand by Cargill. Thus, ICICI's obligation existed independent from the LMJ-Cargill agreement; indeed, it appears that the intended purpose of the EAPG was to protect Cargill's prepayment of $10 million from loss through the use of a third party unrelated to the underlying agreement.

Allied argues that Cargill called on ICICI to pay under the EAPG in order to discharge LMJ's obligation to repay the $10 million purchase price prepaid by Cargill to LMJ. However, this argument misapprehends the EAPG. LMJ's obligation to repay the $10 million prepayment was shifted, in its entirety, to ICICI, when the EAPG was executed in favor of Cargill. Thus, LMJ's obligation to Cargill was extinguished by the EAPG. Further, even after the

15

$450,000 was attached, ICICI sent an additional payment of $450,000 to Cargill to satisfy its liability under the contract. This later transaction is further evidence that LMJ had no additional liability to Cargill under the EAPG. LMJ, therefore, had no cognizable property interest in the funds sent by ICICI to Cargill pursuant to the EAPG. Under Rule B, the funds cannot, therefore, be attached. Accordingly, this Court recommends that the ICICI funds held by JP Morgan pursuant to the Order of Attachment be released and that ICICI's Motion to Vacate Attachment be granted.

III.   The Attachment of BOB's Funds

BOB was involved in two transactions for which EFTs were ultimately attached as they passed through intermediary banks located in New York City. The first attachment challenged by BOB, $108,000 US Dollars held by the Bank of New York, originated in a contract between LMJ and M/A Minermet S.A., Lausanne, Switzerland ("Minermet"). The second attachment, $46,320 US Dollars held by American Express Bank, originated in a contract between LMJ and M/S Agenzia Caffe Verde Srl., Rome, Italy ("Agenzia").

        A. The Attachment of Funds by the Bank of New York

            1.   The Underlying Agreements

On July 12, 2006, LMJ entered into a contract with Minermet whereby LMJ would export agricultural products to Minermet. (See Declaration of D. Narayanan, dated July 13, 2007 ("Narayanan Decl.") ¶ 6.) The contract required Minermet to submit a letter of

16

credit to LMJ for payment of the goods.  Credit Suisse issued an irrevocable letter of credit in favor of LMJ on behalf of Minermet in the amount of $108,000 stating: "Payment instructions: on receipt of documents, at our counters, in conformity with the terms of credit, we shall remit cover in accordance with your instructions."  (Ex. A annexed to Narayanan Decl.; see also Narayanan Decl. ¶ 7.)  BOB was the negotiating bank for LMJ.  (See Narayanan Decl. ¶ 7.)

Irrevocable Letters of Credit are documents issued by a financial institution providing an irrevocable guarantee of payment to a beneficiary upon presentment of complying documents.  (See id. ¶ 3; see also Black's Law Dictionary 923 (8th ed. 2004)(defining "letter of credit" and "irrevocable letter of credit").)  Once the complying documents are presented, the issuing bank is obligated to pay the credit.  (See Narayanan Decl. ¶ 3; see also Black's Law Dictionary, supra.)  To facilitate the process, an intermediary negotiating bank may also be used to stand in the place of the original beneficiary.  See, e.g., Primeshipping, 2006 WL 1539330 at *2 (describing letters of credit).

LMJ presented complying documents to BOB, as the negotiating bank, and BOB then paid LMJ $108,000.  (See Narayanan Decl. ¶ 8.)  BOB then presented LMJ's documents to Credit Suisse and instructed Credit Suisse to pay BOB's New York office $108,000 pursuant to the letter of credit.  (See id. ¶ 9.)  Credit Suisse sent the funds

17

electronically to BOB's United States bank, the Bank of New York ("BNY"), located in New York City.  (See id.)  BNY, pursuant to Allied's Order of Attachment, attached the $108,000.  (See Ex. 3 annexed to Lennon Decl.; Narayanan Decl. ¶ 9.)

The BOB-Credit Suisse transfer was to reimburse BOB for its payment to LMJ.  (See id.)  BOB alleges that Credit Suisse, as part of the EFT, incorrectly listed LMJ as the beneficiary of the funds as part of its payment instructions to BNY.  (See id. ¶ 10.; Ex. 4 annexed to Lennon Decl. (document showing the EFT from Credit Suisse to BOB "favoring" LMJ).)  Credit Suisse then sent a revised EFT with instructions to BNY, stating BOB was the correct beneficiary; however, BNY refused to release the attached funds without a court order.  (See Narayanan Decl. ¶ 11.)

   2.  The $108,000 Held by BNY

In the BOB-Credit Suisse transaction, in which $108,000 was attached by BNY, Credit Suisse initiated an EFT pursuant to an irrevocable letter of credit issued by Credit Suisse after BOB presented it with conforming documents.  Like the letter of credit in Primeshipping, the Credit Suisse letter of credit was a document independent of the underlying LMJ-Minermet contract.  BOB paid LMJ for the documents and presented them to Credit Suisse for payment on the letter of credit.  LMJ no longer held the documents, therefore, it could not demand remittance from Credit Suisse. Thus, it retained no legal interest in the letter of credit at the

18

time Credit Suisse initiated the EFT to BOB.

Allied argues that because Credit Suisse issued the EFT in favor of LMJ, LMJ retained an interest in the funds. BOB explains the initial designation of LMJ as the beneficiary as a mistake. BOB points to the amended EFT, sent by Credit Suisse, naming BOB as the beneficiary, as proof that Credit Suisse agreed that BOB, and not LMJ, was the proper beneficiary of the funds. While it is true that BOB offers no competent evidence that the initial EFT to BOB favoring LMJ was made by mistake, the letter of credit itself is the important document. The letter of credit obligated Credit Suisse to pay the funds when presented with complying documents. Nothing in the letter of credit prohibited LMJ from selling or negotiating the letter of credit, or the complying documents, to BOB. Nor was BOB prohibited from presenting the documents to Credit Suisse to demand payment on the letter of credit.

LMJ had no legal interest in the letter of credit once it received payment from BOB in exchange for the documents. LMJ therefore had no attachable property interest in the funds sent by Credit Suisse to BOB pursuant to the letter of credit. Accordingly, this Court recommends that the funds held by BNY pursuant to the Order of Attachment be released and that BOB's Motion to Vacate Attachment be granted.

  B.   The Attachment of Funds by American Express Bank

      1.   The Underlying Agreement

19

On September 6, 2006, LMJ entered into an agreement with Agenzia whereby LMJ would export agricultural products to Agenzia. (See Narayanan Decl. ¶ 13.) As part of the agreement, the parties used what BOB describes as a Post Shipment Credit Limit ("Credit Limit"), issued by BOB to LMJ, to secure payment. (See id. ¶ 5.) In this type of transaction, as explained by Narayanan, an exporter presents to the bank documentary proof that the goods have been exported. (See id.) The bank then purchases/negotiates the documents from the exporter. Presumably, the purchasing bank then sells/negotiates the documents to the buyer's bank for the value of the documents; the value of the documents is likely the value of the goods shipped.[5]

LMJ presented BOB with documents complying with the terms of the Credit Limit issued by BOB. (See id. ¶ 14.) BOB promptly paid LMJ for the papers in Indian Rupees equivalent to $46,320 US Dollars. (See id.) BOB then forwarded the documents to Veneto Banca[6] and requested that it remit $46,320 in US Dollars to BOB

---

[5] The precise nature of this transaction, as an internal benefit offered by BOB to its customers, is not explained in great detail by BOB. Presumably, these documents work similarly to letters of credit, where upon the presentment of the proper documents, the bank is obligated to buy the papers and/or pay the credit. However, none of the relevant documents have been provided by either LMJ or BOB. The Court is therefore left to speculate as to the actual characteristics of this transaction.

[6] Presumably, this is the bank representing Agenzia, the buyer, though the parties provide no explanation of the relationship between Veneto Banca and either LMJ, BOB, or Agenzia.

through BOB's correspondent United States bank, American Express Bank ("AEB"), for the purpose of reimbursing BOB for its payment to LMJ. (See id.) On January 11, 2007, Veneto Banca sent an EFT and, as the funds reached AEB in New York City, they were attached pursuant to Allied's Order of Attachment. (See Ex. 6 annexed to Lennon Decl.; Narayanan Decl. ¶ 14.)

### 2.  The $46,320 Held by AEB

This transaction differs from the first two in a number of significant ways. First, Allied argues that the assertions made by BOB with regard to the nature of this transaction are not supported by any documentary evidence other than a copy of the LMJ–Agenzia confirmation contract. Further, Allied argues that the Narayanan Declaration was not executed in conformity with 28 U.S.C. § 1746, and should be disregarded as unverified and unreliable. Thus, Allied implicitly argues there is no evidence upon which this Court can rely to make a determination that LMJ had no cognizable property interest in the EFT initiated by Veneto Banca.

Allied's argument regarding 28 U.S.C. § 1746 is unavailing. Compliance with 28 U.S.C. § 1746 need only be substantial, not strict. See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999) (holding a letter containing the statement "[u]nder penalty of perjury, I make the statements contained herein" substantially complied with the statute). Here, Narayanan's Declaration states "I, D. Narayanan, of Bank of Baroda,

21

solemnly affirm and say as follows under penalty of perjury."
(Narayanan Decl.)  Thus, the statement substantially complies with
the statute and shall be considered together with the other sworn
statements and evidence presented by the parties.

However, the failure on the part of BOB to provide any of the
documents controlling the legal relationships between the parties
is troublesome.  The Court is left to speculate about the nature of
the financial instruments involved and, unlike the other
transactions in question, is unable to review the language of the
controlling documents themselves.    In particular, it is not
possible to determine whether LMJ retained any interest in the EFT
from Veneto Banca to BOB.  BOB has not provided the Court with the
document obligating Veneto Banca to pay either BOB or LMJ, or any
agreement between BOB and LMJ whereby LMJ's interest in the funds
would be extinguished by BOB's purchase of the papers.    These
documents are presumably in the care of, or under the control of,
LMJ or BOB.

On the other hand, Allied has provided documents showing that
the Vento Banca credit to BOB was "in favor of LMJ."   (See Ex. 6
annexed to Lennon Decl.)  Furthermore, the documents showing the
actual EFT, provided by Allied, indicate that the "Beneficiary
Customer" was LMJ.   (Id.)  Unlike the Credit Suisse transaction,
BOB has not asserted that the funds in question here were not in
favor of LMJ, or that Veneto Banca made a mistake by listing LMJ as

the beneficiary.

If the description of the transaction provided by Narayanan is in fact accurate, the analysis applied to the previous two transactions could lead the Court to conclude that the funds were not attachable. If, when BOB paid LMJ the rupee equivalent of $46,320 US dollars, it extinguished LMJ's interest in the funds paid from Veneto Banca to BOB, then the funds were not the attachable property of LMJ, even if the transaction referenced LMJ. However, if instead, LMJ was indeed the beneficiary of the EFT, and it retained a legal interest in those funds, LMJ would have a property interest in the EFT.

Allied has produced documents showing that LMJ was the beneficiary of the EFT initiated by Veneto Banca to BOB, and thus, LMJ has a property interest in the $46,320 held by AEB. Narayanan's general description of the underlying transaction, offered without any evidentiary support, is not sufficient to overcome the evidence provided by Allied that LMJ was the intended beneficiary of the EFT. Furthermore, the documents that would indicate whether or not LMJ had any interest in the funds, have not been produced by LMJ or BOB. The Court therefore finds that Allied has provided sufficient evidence showing that LMJ has a property interest in the funds. As a result, the Court must now determine whether LMJ's property interest in the EFT is subject to attachment. See Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263

(2d Cir. 2002).

### 3.  EFTs are Attachable Property

In <u>Winter Storm</u>, the Second Circuit held that EFTs are attachable property pursuant to Rule B.  <u>See</u> 310 F.3d 263.  The more recent case of <u>Aqua Stoli</u> affirmed <u>Winter Storm</u>'s holding.[7] <u>See Aqua Stoli</u>, 460 F.3d at 436 ("Under the law of this circuit, EFTs to or from a party are attachable by a court as they pass through banks located in that court's jurisdiction") (citing <u>Winter Storm</u>); <u>see also</u> <u>General Tankers</u>, 475 F. Supp. 2d at 398-99. Therefore, the law in this Circuit is, at this time, that EFTs sent to a beneficiary defendant are attachable under Rule B.  <u>See</u> <u>General Tankers</u>, 475 F. Supp. 2d at 398-99 (upholding attachment of EFT though defendant is the beneficiary); <u>Compania Sudamericana de</u> <u>Vapores S.A. v. Sinochem Tianjin Co.</u>, No. 06 Civ. 13765, 2007 WL 1002265 at *4 (S.D.N.Y. Apr. 4, 2007) (same); <u>but see Seamar</u>

---

[7]  <u>Aqua Stoli</u> did question the viability of <u>Winter Storm</u>'s holding that EFT funds in the hands of intermediary banks are attachable.  <u>See Aqua Stoli</u>, 460 F.3d at 445 n.6.  However, the uncertain future of the viability of <u>Winter Storm</u> does not mean that <u>Winter Storm</u> is no longer controlling law.  <u>See AET Inc.</u> <u>Ltd., v. Procuradoria de Servicos Maritmos Cardoso & Fonesca</u>, 464 F. Supp. 2d 241, 244 (S.D.N.Y. 2006) (finding <u>Winter Storm</u> binding law).  Furthermore, <u>Aqua Stoli</u> should be placed within its factual context.  <u>Aqua Stoli</u> overturned a district court opinion that added additional criteria to the standard for vacating an attachment, beyond the requirements of Rule B.  <u>See</u> 460 F.3d at 443-44.  The focus of <u>Aqua Stoli</u> was not on <u>Winter Storm</u>, or its analysis of EFTs, but on the necessary showing before a motion to vacate an attachment should be granted.  <u>See</u> <u>id.</u>  Thus, <u>Aqua Stoli</u>'s comment, in dicta, on the viability of <u>Winter Storm</u>, has not changed the law applicable to this case. <u>See General Tankers</u>, 475 F. Supp. 2d at 398-99.

<u>Shipping</u>, 461 F. Supp. 2d at 226 (vacating attachment because defendant was the beneficiary).[8]

The language of Rule B permits attachment of a defendant's intangible property interests. Fed. R. Civ. P. Supp. R. B(1)(a). One such interest is the contractual expectancy interest that a beneficiary has in a payment made to it through the use of intermediary banks. See <u>Navalmar</u>, 485 F. Supp. 2d at 408; see also <u>General Tankers</u>, 475 F. Supp. 2d at 398-99.  <u>Winter Storm</u> holds that funds in which the defendant has an intangible property interest as the beneficiary of an EFT, in the hands of an intermediary bank, may be attached pursuant to Rule B.  See, 310 F.3d at 278; <u>accord</u> <u>Aqua Stoli</u>, 460 F.3d at 436.  Therefore, the Court finds that LMJ has an attachable property interest in the

---

[8]  In <u>Seamar Shipping</u>, Judge Rakoff concluded that when the defendant is the beneficiary of an EFT, the defendant has no property interest in the funds.  See 461 F. Supp. 2d at 226.  He reached this conclusion by noting that <u>Aqua Stoli</u>'s language calling into question <u>Winter Storm</u> required the court to read <u>Winter Storm</u> narrowly.  See <u>id.</u> at 225.  Consequently, he concluded that <u>Winter Storm</u> stands only for the proposition that funds are attachable property if the originator of the EFT is the defendant, but not if the defendant is the beneficiary.  <u>Id.</u>  He then turned to New York State law, which holds that the beneficiary has no property interest in funds sent via EFT until the transfer is complete.  <u>Id.</u>  As such, he concluded that plaintiffs cannot attach funds held by an intermediary bank if the beneficiary of the EFT is the defendant.
    To this Court's knowledge, the approach in <u>Seamar Shipping</u> has not been followed by any other district court.  See <u>Compania Sudamericana</u>, 2007 WL 1002265 at *4 (listing recent decisions rejecting <u>Seamar Shipping</u>'s approach); see also <u>Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Tohren, Ltd.</u>, 485 F. Supp. 2d 399 (S.D.N.Y. 2007) (holding "the law of <u>Winter Storm</u> must prevail, as a matter of federal supremacy [over New York State law]").

$46,320 held by AEB.  Finally, BOB has not argued, nor has the Court found, any support for the existence of any of the limited equitable grounds permitting vacatur under Aqua Stoli.  Thus, BOB's motion to vacate the Order of Attachment, as it relates to these funds, should be denied.

IV.  Motion to Confirm Arbitration Award

In the 2007 Order, the District Court held: "As defendant has advanced no cogent reason for failing to recognize, confirm and enforce the [Arbitration] [A]ward, the Court would be well within its rights in granting plaintiff's motion."  (2007 Order.) However, rather than granting the motion outright, the District Court permitted LMJ to file a further response to Plaintiff's motion before July 7, 2007.  (Id.)  LMJ did not file any further response.

Instead, in a Declaration dated July 7, 2007 ("Finkel Decl."), Adam Finkel, LMJ's counsel, stated: "LMJ . . . is not further contesting the recognition and confirmation of the arbitral award." (Finkel Decl. ¶¶ 7, 8.)  LMJ then asked the District Court to stay a decision on the Motion to Confirm until the Motions to Vacate were decided, and the Second Circuit decided the appeal of two district court decisions relevant to whether EFTs are subject to attachment.  (Id.)  However, the District Court had already denied LMJ's motion to stay, presented for substantially the same reasons, in the 2007 Order.

26

Therefore, in light of the 2007 Order, and LMJ's decision not to file any further response to the Motion to Confirm, or to further contest the Motion to Confirm, the Court respectfully recommends that the Motion to Confirm the Arbitration Award be granted.

## CONCLUSION

For the reasons set forth above, the Court recommends that the Order of Attachment be vacated as to the funds being held by JP Morgan and Bank of New York, but be maintained as to the funds being held by American Express Bank.  The Court further recommends that the Motion to Confirm, Affirm, and Enforce Arbitral Award be granted.

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this report to file written objections.  See also Fed. R. Civ. P. 6(a) and (e).  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Lewis A. Kaplan, United States District Judge, and to the chambers of the undersigned, Room 1660.  Any requests for an extension of time for filing objections must be directed to Judge Kaplan.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 475 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).

27

28

Respectfully Submitted,

---
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: October 23, 2007
       New York, New York

28