# EXHIBIT 4

```
                                                                    1

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   PRESTIGIOUS SHIPPING,

 4              Plaintiff,

 5         v.                                   07 CR 7101

 6   AGROCORP INTERNATIONAL,

 7              Defendant.

 8   ------------------------------x
                                                New York, N.Y.
 9                                              September 4, 2007
                                                2:46 P.M.
10
     Before:
11
                     HON. COLLEEN MCMAHON,
12
                                                District Judge
13
                          APPEARANCES
14
     WAESCHE, SHEINBAUM & O'REGAN, PC.
15       Attorney for John Foster
     BY: JOHN FOSTER, ESQ.
16
     AGROCORP INTERNATIONAL
17       Attorney for Defendant
     BY: OWEN F. DUFFY, ESQ.
18

19

20

21

22

23

24

25
```

Rule B Hearing

Page 2

1   (Case called)
2   THE COURT: All right. Ergonomic chair. So much
3   better, thank you. Okay, I have read the papers. Let's see if
4   I can get the facts straight. Or let's see if I have gotten
5   the facts straight. Agrocorp bought rapeseed in the Ukraine.
6   MR. DUFFY: Yes, your Honor.
7   THE COURT: Right. And it proceeded to sell the
8   rapeseed to somebody else.
9   MR. DUFFY: In a back-to-back transaction, yes. And
10  it had its bank, Indian Bank, finance the transaction.
11  THE COURT: Right, but Indian Bank did not issue a
12  letter of credit. Indian Bank was supposed to do a letter of
13  credit transaction with Agrocorp's purchaser.
14  MR. DUFFY: Ultimate buyer, yes.
15  THE COURT: The ultimate buyer.
16  MR. DUFFY: That's correct.
17  THE COURT: What Agrocorp or what Indian Bank did for
18  Agrocorp was pay the money that Agrocorp would otherwise have
19  had to pay, or that Agrocorp owed, to the person in the Ukraine
20  from whom he bought the rapeseed.
21  MR. DUFFY: Correct, your Honor.
22  THE COURT: Okay. And that's the money that was going
23  through the electronic fund transfer process here in New York
24  when it was netted.
25  MR. DUFFY: Correct, your Honor.

Page 3

1   THE COURT: Right. Okay.
2   The money that Indian Bank was extending to pay the
3   debt that was owed by Agrocorp for the rapeseed that Agrocorp
4   bought in the Ukraine, right. So why is this not just exactly
5   like Judge Pauley's case?
6   MR. DUFFY: Your Honor, I think — if I may, Judge
7   Pauley's case, first of all, was a completely different case.
8   That was an alter ego situation where there were two related
9   companies, Mar Trade and Mar Logic.
10  THE COURT: Right. And one was being used to pay the
11  debt of the other.
12  MR. DUFFY: And in obvious method to —
13  THE COURT: To circumvent this ridiculous Rule B
14  attachment situation that has turned into such a nightmare for
15  everyone, especially since the Winter Storm case.
16  MR. DUFFY: Correct, your Honor. And in that case,
17  they came right out in front of — Judge Pauley found, look,
18  you're both doing the same business, you're doing the business
19  of one or the other, you're an alter ego. That's why I would
20  submit to you that this case in front of you is more along the
21  lines of prime shipping, although we don't have a letter of
22  credit issued by our bank. But what our bank did, Indian Bank,
23  they bought those bills of lading. They were not going to pay
24  any money until somebody gave them bills of lading and they
25  applied title to the cargo which they could then present to get

Page 4

1   the money under the other transaction. This is what banks do.
2   They make money off the backs of other people's transactions,
3   they get interest, and this is part of their normal business.
4   This was not an alter ego situation. They were not paying a
5   debt for Agrocorp because they were trying to accommodate them
6   in a Rule B situation. They were trying to make money. And
7   they said, fine, we'll do the same thing. You give me a trust
8   receipt. I take title to the cargo. I have full right to
9   collect money from the ultimate seller, and I'm never debiting
10  your account. I'm not — I'm not giving you a loan. This is a
11  finance transaction where I'm going to make some money and you
12  can make your money. And that's why I submit to you it is the
13  same case as Prime Shipping, in a little different posture.
14  THE COURT: Okay. Why is this not Prime Shipping? I
15  mean I know it is not a letter of credit. I, to be quite
16  honest, know a lot about letters of credit and nothing
17  whatsoever about trust receipts. But is there a difference
18  between a trust receipt and a letter of credit, that makes a
19  difference?
20  MR. FOSTER: Yes, your Honor. And I think the
21  critical difference between the two cases is that, in Prime
22  Shipping, there was a negotiable letter of credit which the
23  bank there, BNP Paribas, had purchased, and the proceeds that
24  were locked were going to in payment of that letter of credit.
25  So that at the time of the attachment, the defendant didn't

Page 5

1   have any interest in the letter of credit or its proceeds
2   because it had negotiated it away.
3   THE COURT: That, I understand. And your opponent
4   says that — if I understand his argument correctly, that
5   Agrocorp had negotiated away its interest in — its financial
6   interest in this transaction, although its financial interest
7   was as a payor of the payee, owed money. That it had
8   negotiated that away. Because it had sold the bills of lading
9   to Indian Bank in exchange for Indian Bank's agreeing to take
10  over the obligation of making payment for the cargo. It was
11  out. It was out. It is saying it is just as out as somebody
12  who holds an underlying debt but who arranges to make payment
13  for it through a letter of credit. Where, as Judge Rakoff
14  absolutely correctly indicated, the bank's obligation to honor
15  the letter of credit is completely independent of the
16  underlying debt. The underlying debt may be a bad debt, that
17  is too bad. That gets resolved some other time. If the proper
18  papers are presented at the bank window, the bank must pay out
19  on the letter of credit. And I — as I say, I don't — I never
20  heard of a trust receipt before today. I don't know what that
21  makes me. But as it's being explained to me, what is the
22  difference that makes a difference between a trust receipt and
23  a letter of credit.
24  MR. FOSTER: Well, one difference, your Honor, which
25  is of significance, is that letter of credit is a negotiable

Page 6

1 instrument, and a trust receipt is more like a security
2 interest. And the importance of that goes back to, again, the
3 idea that when the proceeds on the letter of credit were sent
4 to Paribas, they were going to an outfit that at that time
5 owned the letter of credit.
6     In this particular case, your Honor, going back to,
7 you know, your initial line of reasoning, is that the seller in
8 Ukraine issued invoices to Agrocorp which are exhibits to
9 the --
10     THE COURT: Right. And whatever the -- whatever -- as
11 far as they were concerned -- the money was going to the
12 Ukraine when it was intercepted, right? The invoices were
13 being --
14     MR. FOSTER: Apparently so.
15     THE COURT: The invoices were being paid. That was
16 the purpose of the -- whether it was coming from Indian Bank or
17 Agrocorp, it was to pay those invoices.
18     MR. FOSTER: Right, your Honor. Those invoices that
19 were addressed to Agrocorp, which were the debt of Agrocorp.
20     THE COURT: Right.
21     And India Bank had said we'll take on your debt in
22 exchange for title to the rapeseed which we will then make a
23 little money on when we factor it over to the ultimate seller.
24     MR. FOSTER: Well, your Honor, I --
25     THE COURT: That --

Page 7

1     MR. FOSTER: I wouldn't put it quite that they were
2 taking over the debt. What they were doing was taking over the
3 documents on the underlying transaction so that they could
4 then, in turn, pass them on to the ultimate purchaser, get the
5 money, keep what it had advanced on its payment with the
6 difference going to Agrocorp.
7     THE COURT: I'm not sure I understand where the money
8 was. The money was on its way to the Ukraine, right?
9     MR. FOSTER: Yes, your Honor.
10     THE COURT: The money was on its way to the Ukraine.
11 On its way to pay off the original purchase price of the --
12     MR. FOSTER: Rapeseed.
13     THE COURT: Of the rapeseed. Okay. That was a debt
14 that was incurred by Agrocorp.
15     MR. FOSTER: Yes, your Honor.
16     And in return for that, the bank would get the
17 documents, like the bill of lading and the other shipping
18 documents, which it could then pass on to the ultimate buyer.
19 The ultimate buyer would make the payment, which would go to
20 Indian Bank. Indian Bank would keep what it had advanced and
21 credit the difference to Agrocorp, which was Agrocorp's profit
22 on it.
23     THE COURT: Right. And, eventually, Agrocorp was
24 going to end up with some money here, so -- and isn't that the
25 reason that Indian Bank is not in the same position as Paribas

Page 8

1 as the purchaser of the negotiable letter of credit?
2     MR. FOSTER: If I understand your Honor correctly, I
3 think that is right, I mean in that --
4     THE COURT: I mean it is just silly to say that
5 Agrocorp was not going to end up with its profit on the
6 transaction. It wasn't out. It was going to end up with some
7 money.
8     MR. FOSTER: Right, your Honor.
9     THE COURT: Less some fee to Indian Bank.
10     MR. FOSTER: Right, your Honor. In other words, I
11 mean just to use numbers, it was buying it -- the rapeseed from
12 the people in Ukraine for a hundred dollars and selling it to
13 the ultimate purchaser for $150. Indian Bank was advancing
14 that hundred dollars, and from the ultimate proceeds would get
15 that hundred dollars back with Agrocorp keeping it's $50. But
16 as part of --
17     THE COURT: That would involve Agrocorp keeping $47
18 because Indian Bank would always take a fee.
19     MR. FOSTER: Yes, your Honor.
20     THE COURT: I mean there is no reason to do this
21 otherwise.
22     MR. FOSTER: Right exactly.
23     But as part of this, Agrocorp incurred a debt to the
24 people at the Ukraine which Indian Bank -- and for which there
25 were invoices which Indian Bank was then transferring money to

Page 9

1 satisfy.
2     THE COURT: Correct. All right. And you're position
3 on the Judge Pauley case is that it doesn't make a difference
4 that the that two entities were corporately related --
5     MR. FOSTER: No. No, your Honor.
6     THE COURT: -- and that one -- and that they were
7 trying do a slight of hand.
8     MR. FOSTER: No, your Honor. I mean this case doesn't
9 involve that. I mean from everything that counsel has
10 presented, it looks like a straightforward financing
11 transaction. So there is none of the funny business going on
12 in that respect. But it does go back to the basic point which
13 Judge Pauley addressed, which was what does intangible property
14 in Rule B mean. And he gave it as the Second Circuit did in
15 Winter Storm, a very broad interpretation.
16     THE COURT: Okay.
17     What else do you want to say to me, and what else do
18 you want to say to me. And I can ruminate on this for a --
19     MR. FOSTER: Well, your Honor, I would just -- I think
20 that -- I mean I --
21     THE COURT: I don't buy the Judge Sweet jurisdiction
22 argument, okay, I don't buy that. I don't buy that that --
23     MR. FOSTER: I guess, your Honor, I will be the first
24 to recognize that the flourishing of Rule B practice has become
25 an inconvenience unto the Court.

Page 10

1 THE COURT: Well, I think it is more than an
2 inconvenience. It is just a classic example of not thinking
3 through the practical consequences of a decision. And I say
4 this with the highest regard to my dear friend, Judge Haight
5 who knows more about ships at see than all of the rest of us
6 combined ever will. But perhaps less about electronic fund
7 transfers. And I do note that then Chief Judge Walker,
8 indicated in a footnote in Aqua Stoli that there are at least
9 some people on the Second Circuit who are questioning the
10 correctness or, if not the wisdom, of Winter Storm. But of
11 course that is their problem to solve, that is not my problem
12 to solve. I have to do what they tell me to do.
13 MR. FOSTER: Understood, your Honor. And all of us
14 can only play the hand we're dealt.
15 THE COURT: Correct.
16 MR. FOSTER: But I mean I -- I guess, notwithstanding
17 the footnote in Aqua Stoli which, to my understanding, it has
18 been principally Judge Rakoff who has run with that ball that
19 most of the judges in the district have looked on this whole
20 proceeding as pretty straightforward. And, in fact, the -- one
21 of the cautions in the Aqua Stoli opinion is that what this
22 should become is a fact intensive sort of exercise, because
23 then we'll --
24 THE COURT: But that is not the statute Congress
25 wrote.

Page 11

1 MR. FOSTER: I'm sorry, your Honor?
2 THE COURT: Because that is not the statute Congress
3 wrote, or the rule that Congress didn't overturn.
4 MR. FOSTER: Exacily, exactly.
5 So it is going back to the earlier point. I mean the
6 rule is what it is. And Winter Storm and Aqua Stoli are what
7 they are, your Honor. And my submission would be that I think
8 this is pretty straightforward and that -- and that frankly the
9 whole thing would be simplified if Agrocorp simply gave us a
10 letter of credit.
11 Thank you.
12 MR. DUFFY: Yes, your Honor. So I am understanding
13 your point that we're not going too far on the first argument.
14 THE COURT: We're not going anywhere on the first
15 argumet.
16 MR. DUFFY: Okay.
17 THE COURT: I had read Aqua Stoli before today, and I
18 read it again today. And I do believe that when the Second
19 Circuit uses the word -- is Aqua Stoli here -- jurisdiction --
20 or it talks about districts, not just about jurisdiction.
21 MR. DUFFY: As opposed to --
22 THE COURT: Not just about jurisdiction.
23 MR. DUFFY: Yeah.
24 THE COURT: It says: A district court may vacate
25 maritime attachment only if a defendant would be subject to an

Page 12

1 in personam lawsuit in a jurisdiction adjacent to the one in
2 which the attachment proceedings were brought. That is the
3 across the river. A maritime attachment would likewise be
4 properly vacated if the plaintiff and the defendant are both
5 present in the same district and would be subject to
6 jurisdiction there. Didn't say present in the same
7 jurisdiction. Believe me, I am sympathetic to the argument --
8 MR. DUFFY: Yes.
9 THE COURT: -- that both the plaintiff and the
10 defendant in this case are present in the same jurisdiction,
11 and it is nowhere in the United States.
12 MR. DUFFY: That's correct.
13 THE COURT: I am sympathetic to that.
14 But it seems to me, that what the Circuit very clearly
15 said is that I could properly vacate the attachment if both
16 parties were present in the same district, which is a term of
17 art under federal jurisprudence, and refers to a district court
18 within the United States Federal Court system, not someplace
19 overseas.
20 And I know that Judge Sweet opined otherwise. I can
21 only say this. That was about the fifth line of reasoning for
22 them. He didn't have to go there, he didn't have to say that.
23 And because he was so clearly right on everything that had come
24 before that, and -- and I just -- I don't think that that is
25 what the Second Circuit was saying at all so, no, that argument

Page 13

1 isn't going to cut it with me.
2 MR. DUFFY: Okay.
3 THE COURT: I --
4 MR. DUFFY: I'm, you know, I --
5 THE COURT: And since you conceded --
6 MR. DUFFY: Yeah.
7 THE COURT: -- that the Rule B showing has been made
8 with plaintiff, if this were just Agrocorp's application, I
9 would simply deny the motion and that would be it. The only
10 thing that is intriguing here is the Indian Bank financing
11 argument and application --
12 MR. DUFFY: Yeah.
13 THE COURT: -- so.
14 MR. DUFFY: If you would bear with me one second, your
15 Honor. The only thing I would say about the district is it
16 kind of reaches in a logical conclusion that if two parties are
17 in the United States in the same district, they are forbidden
18 from coming to New York to get security for an attachment that
19 they are arbitrating down in Huston.
20 THE COURT: They are not forbidden, but a court
21 exercising equitable discretion may conclude that it would be
22 better to attach whatever assets were down in Huston where the
23 two companies were, than to worry about electronic funds
24 transfers in New York.
25 Look, this whole thing, we don't do a lot of this in

Page 14

1  White Plains. And this, the whole thing is a new area of
2  jurisprudence for me. And I, as a policy, I fine horrifying
3  that -- that one could, by virtue of the fortuity of the fact
4  that every banking transaction in the world seems to hop
5  through New York, you can get in rem jurisdiction in a maritime
6  action, that has nothing do with New York -- or with the United
7  States, for that matter -- and that is between two foreign
8  enterprises and yet if you look back at the history of maritime
9  jurisprudence, there is an awful lot of it that doesn't involve
10 entities on either side that were in the United States. They
11 happened to have assets in the United States. I mean in the
12 olden days, it was a cargo ship that was sitting in a harbor
13 somewhere in the United States, and then it was convenient bank
14 account that was kept in the United States. And the Second
15 Circuit has decided in its wisdom for the time being that they
16 will include electronic fund transfers that are going be here
17 for 10 or 15 seconds in the United States. So, there is
18 nothing I can do about that.
19      MR. DUFFY: Okay, point taken, your Honor.
20      I would just address the other point, then on the
21 Indian bank's motion. And, again, I won't profess to be an
22 expert in secure transactions or anything else like that. I'm
23 basically a maritime lawyer, but I am familiar with these
24 things.
25      My understanding of trust receipts is it was used in

Page 15

1  the United States years ago -- as a matter of fact there was a
2  trust receipts act that they had that kind of got subsumed by
3  the UCC, in Article 9 secured interest. And it is just not a
4  popular means of financing in the United States anymore.
5      THE COURT: Clear that none of us has ever heard of
6  it.
7      MR. DUFFY: But it's still used. I mean the clients
8  here are based in Singapore. But they are basically an Indian
9  trading company, and they are used quite often in foreign
10 countries. And especially -- I don't want to say -- I'm not
11 going to say it on the it record. You know, developing
12 countries or expanding countries.
13     THE COURT: And I would say based on what you have
14 said, it seems that it's something that is still recognized in
15 parts of the old British empire.
16     MR. DUFFY: Correct, your Honor.
17     And I would submit to you on the same case, I mean the
18 parties in this case, they could have gone and opened up a
19 letter of credit with Indian Bank and said, here, we'll open up
20 a letter of credit in favor of this buyer who is selling
21 Ukrainian rapeseed, but they don't go through all of those
22 motions, because they had a relationship with the bank for 16
23 years. The bank said, look, all's I'm interested in is I'm
24 willing to pay the money, but I don't want to get in a position
25 where I get scammed, so you make sure that I get the bills of

Page 16

1  lading and that there is a buyer set up who has a letter of
2  credit open so that when I collect them and I present them --
3      THE COURT: I'll forget the documents at the bank
4  window and I'll get paid.
5      MR. DUFFY: And I'll get paid, and you're out of it
6  until whatever is left over, I'll credit into your account.
7  I'm never debiting your account, I'm never loaning you money,
8  I'm in this for business. And that is why this is the same
9  case --
10     THE COURT: I kind of disagree with, I'm never loaning
11 you money. I'm not giving you a traditional bank loan, but
12 that is not what fact over financing is ever about. Of course
13 I'm loaning you money. I didn't buy the rapeseed. What does
14 Indian Bank want with rapeseed, they have no use for rapeseed.
15     MR. DUFFY: That's why it is the same as the situation
16 in Prime Shipping because, there, the defendant Wajilam, he
17 went to his bank and he said, look, I need the money fast,
18 discount this and you'll take the money. And I mean that is
19 exactly what was going on here. You have more money than I do,
20 you have cash available, you take care of this, and we'll --
21 get things -- we'll get the sale done.
22     THE COURT: All right.
23     Let me disappear for a few minutes, okay.
24     MR. DUFFY: Okay, your Honor.
25     THE COURT: A want to look at Judge Rakoff's and Judge

Page 17

1  Pauley's decision here.
2      (recess)
3      THE DEPUTY CLERK: Come to order please.
4      THE COURT: Okay. See if I can dispose of this.
5      The plaintiff, Prestigious Shipping Company, Limited,
6  obtained from this Court some weeks ago --
7      I can't remember the exact date, but --
8      MR. FOSTER: August 9th, your Honor.
9      THE COURT: -- August 9. Thank you.
10     -- a process of maritime attachment and garnishment ex
11 parte against defendant, Agrocorp International, PTE, Limited.
12     Prestigious had asserted a claim against Agrocorp for
13 breach of the charter party, dated February 21, 2005. That
14 claim is presently being arbitrated in London, England. With
15 the issuance of the process of maritime attachment and
16 garnishment this Court authored Prestigious to attach property
17 of Agrocorp which could be found in possession of garnishees
18 located in the Southern District of New York up to the amount
19 of $2,160,761.06, as security for the claim which is presently
20 being arbitrated in London.
21     The process of attachment and garnishment was served
22 on several banks in New York. One garnishee restrained on the
23 21st of August, I believe, and I got that date off one of the
24 exhibits in Indian Bank's submission to the Court, that being
25 the fax from American Express Bank to Agrocorp, indicating that

Page 18

1 the moneys had been restrained.
2   So on or about the 21st of August, American Express
3 Bank restrained an electronic transfer in amount of $604,036.93
4 that was being remitted by Indian Bank, a bank with which
5 Agrocorp has had a business relationship for many years --
6 according to counsel. I am in no position to dispute that,
7 seems to be correct. And it was being remitted to the account
8 of a nonparty seller whose name is --
9     Firebird, I believe?
10    MR. DUFFY: Firebird, Limited. Yes, your Honor.
11    THE COURT: Firebird, Limited, located in Riga,
12 Lativa.
13     The underlying cargo that this particular transfer
14 related to was a cargo of rapeseed which was being shipped from
15 the Ukraine, where it had been purchased. And, I believe --
16 let me see if I can -- I have to find it. The contract date
17 between Firebird and Agrocorp was July 11, 2007. That is
18 exhibit 2 to Indian Bank's submission. The invoice was
19 actually dated July 8th, 2007, and that's exhibit 3. And
20 sometime prior to August 20, Agrocorp had, you know,
21 back-to-back transaction, resold the cargo of rapeseed to
22 another party, who fortunately has nothing do with this matter,
23 because there are already too many parties for me to remember
24 all of the names.
25     So, the attachment and garnishment process issued, as

Page 19

1 I say, on the ninth of August. The invoice had issued for the
2 rapeseed. The money was due. And so it appears that Agrocorp
3 went to its bank, Indian Bank, in Singapore, a bank with which
4 they had a preexisting banking facility -- a copy of which is
5 attached to Indian Bank's application as exhibit 1 - and asked
6 Indian Bank to finance the purchase of the rapeseed. And the
7 critical exhibit for this purpose is Indian Bank's exhibit 4,
8 by fax and by hand, on Agrocorp International PTE, Limited
9 stationery, dated 20 August 2007 or 11 days after the
10 attachment order issued. And it's a request for invoice
11 financing for U.S. dollars 604,036.93 import drawn by M.S.
12 Firebird, Limited tort shipment of 1351 MTS Ukraine rapeseed
13 shipped by vessel MV Rita, V70018M.
14    This communication sent by a Mr. Yingar, a director of
15 Agrocorp said: We enclose herewith a copy of the supplier's
16 invoice and the necessary T/R -- which I believe means trust
17 receipts -- form for import trust receipts financing in U.S.
18 dollar currency for amount $604,036.93 for the shipment of the
19 Ukrainian rapeseed from Illichivsk, Ukraine to Chittagong
20 Bangladesh on board MV Riga. We request to seek approval to
21 remit the funds to subject party. Please note that we have
22 taken possession of the goods and sale to MS Bengal Corporation
23 and MS Bismillah Dahl Mill, Bangladesh, on letter of credit
24 sight terms; that is to say that the sale by Agrocorp to its
25 purchaser required the purchaser to post a letter of credit on

Page 20

1 sight terms. And Mr. Yingar's communication goes on to say:
2 We will forward the necessary export documents to your bank in
3 due course.
4     Please note that once the above sale of proceeds is
5 received -- that is the money that was to go to the seller, to
6 Agrocorp -- the same can be utilized to adjust the advance
7 before due date. The necessary trust receipts forms are also
8 enclosed herewith. Upon approval, please arrange to remit the
9 total amount of U.S. dollars $604,036.93 to the following
10 account with value date today. The beneficiary is named as
11 Firebird, Limited, and the bank is the Regional Investment Bank
12 JSC, in Riga, Latvia. The transfer is to mention "payment for
13 your invoice 11312, 11297, and 11325-1351MTS, rapeseed. The
14 necessary bank charges can be debited separately to our U.S.
15 dollar account with you."
16    The response was that, immediate, the money was wired
17 out. As so much of the money in the world does, it flitted
18 through New York on its way from Singapore to Riga, and it was
19 netted there by American Express Bank, Ltd. which had
20 previously been served with the maritime attachment process.
21    And, on the following day, the 21st of August, at
22 5:56 p.m., a fax was sent to Agrocorp saying: With respect to
23 transaction reference number 070320-20878 -- don't quote me on
24 that -- please be advised that AEB New York, American Express
25 Bank of New York, was served with, and several other New York

Page 21

1 banks were also served with, a process of maritime attachment
2 and garnishment. This writ obliged American Express Bank to
3 block attached funds belonging to Agrocorp International, PT,
4 Limited, up to $2.16 million US.
5     Under applicable US federal law, AEB was required to
6 block your $604,036.93 payment order and to move these funds
7 into a blocked account. And this was sent to Indian Bank on --
8 apparently with a copy to Agrocorp.
9     Indian Bank responds swiftly, the next day, the 22nd
10 of August saying: We refer to your swift -- dated -- I
11 shouldn't have said swift --
12    We refer to your transaction, reference number and
13 your swift dated 21 August 2007. Please note that $604,036.93
14 US dollars belongs to Indian Bank, Singapore fund, and not to
15 our customer, Agrocorp International, PTE Ltd. Indian Bank has
16 financed Agrocorp's purchase of the Ukrainian rapeseed shipped
17 on the vessel MV Rita, V70018M. Attached is the request for
18 invoice financing executed by Agrocorp in our favor being sent
19 through your Singapore office. These moneys belong to us and
20 have been wrongly attached.
21    On successive days last week, orders to show cause
22 were presented by Prestiglous Shipping and then by Agrocorp
23 International, both represented by attorney Owen Duffy, seeking
24 vacatur of the attachment of these funds on, essentially, two
25 grounds.

Page 22

1   The first ground was that the Court should exercise
2 its equitable power as reserved by the United States Court of
3 Appeals for the Second Circuit in the Aqua Stoli case,
4 460 F3d. 434, and should vacate the attachment on the ground
5 that both the plaintiff and the defendant in this action,
6 Prestigious and Agrocorp, can be found in Singapore, and would
7 be subject to jurisdiction there. And counsel for Prestigious
8 argued that this was one of the grounds that the Second Circuit
9 had specifically identified in Aqua Stoli, as a ground on which
10 a district court would have equitable discretion to vacate a
11 maritime attachment that complied with maritime Rule B. And
12 for purposes of this application, it is conceded by Prestigious
13 that this particular attachment complies with maritime Rule B.
14 That is to say Prestigious has conceded for purposes of this
15 motion that -- or I should say Agrocorp has conceded for
16 purposes of this motion that Prestigious has a valid prima
17 fascia admiralty claim against Agrocorp, that Agrocorp cannot
18 be found within the Southern District of New York, that its
19 property may be found within the district, and there is no
20 statutory and maritime bar to the attachment.
21   So until India Bank got in and said it was my property
22 and it is not their property, I had basically a concession that
23 it was a proper Rule B maritime attachment.
24   And, as I say, Mr. Duffy argued that the attachment
25 should be vacated because both plaintiff and defendant were

Page 23

1 present in different jurisdictions and would be subject to
2 jurisdiction there, that jurisdiction being Singapore.
3   As I indicated during oral argument, I did not find
4 this line of reasoning particularly persuasive, although I
5 think it is immensely clever.
6   The Second Circuit in Aqua Stoli basically did all but
7 tie the hands of a district court when confronted with a
8 maritime attachment that complies with the requirements of
9 Rules B and E.
10   The Second Circuit did say that district courts are
11 not without any equitable discretion to vacate maritime
12 attachments that comply with Rule B. But it said that
13 following integrated and other prerule E(4)(f)cases, we believe
14 that an attachment may be vacated only in certain limited
15 circumstances, taking care to note that the precise bounds of a
16 district court vacatur powers were not then before it.
17   The Second Circuit identified three circumstances in
18 which it thought it would be appropriate for a district court
19 in an exercise in equitable discretion to vacate a maritime
20 attachment. One was the across-the-river situation, where the
21 defendant can show that it would be subject to in personam
22 jurisdiction. In another jurisdiction that was convenient to
23 the plaintiff, the Second Circuit indicated that the concept of
24 convenience was a narrowly circumscribed one, that convenient
25 meant adjacent to the one in the attachment proceedings were

Page 24

1 brought, which would mean were brought -- would mean for our
2 purposes were the attachment proceedings brought here, the
3 eastern, southern -- or eastern, western or northern districts
4 of New York, all of which are, at some point, adjacent to the
5 Southern District of New York, perhaps the District of
6 Connecticut and New Jersey, as well, but there is no evidence
7 in the record to indicate that Agrocorp is present in any of
8 those jurisdictions, so we're not talking about that particular
9 exception.
10   Vacatur would also be proper, the Second Circuit said,
11 if the defendant's assets sufficient to satisfy a judgement
12 have already been secured elsewhere, yet the plaintiff seeks a
13 further attachment. An example of this particular reason for
14 vacating attachment is Judge Sweet's vacatur of the attachment
15 in OGI Ocean Gate Transportation Company against RP Logistic
16 PVC, Limited, which can be found at 2007 US District Lexus
17 46841. And, in that case, the amount of the debt was $45,000.
18 And $45,000 had been attached somewhere else. And, therefore,
19 what I think comes to foster, counsel for what Prestigious has
20 referred to as double dipping reason for exercising equitable
21 discretion and vacating attachment did not apply.
22   So, that leaves the one that the defendant cited. And
23 the problem is that what the Second Circuit said is not exactly
24 what the defendant said the Second Circuit said.
25   The Second Circuit said the maritime attachment would

Page 25

1 likewise be properly vacated if the plaintiff and defendants
2 are both present in the same district and would be subject to
3 jurisdiction there. But the plaintiff goes to another district
4 to attach defendant's assets. I do not understand the Republic
5 of Singapore to be a district within the meaning of that term
6 as used by the Second Circuit. And I do not understand the
7 Second Circuit's statement to be an authorization by this Court
8 to vacate a maritime attachment when both the plaintiff and the
9 defendant can be found in another jurisdiction all together,
10 that jurisdiction being in a country half way around the world.
11   Therefore, I have to reject the defendant, Agrocorp's
12 argument that the attachment ought to be vacated on that
13 ground.
14   Much more interesting is the argument made by Indian
15 Bank, which is that the money doesn't belong to Agrocorp, the
16 money belongs to it.
17   Prestigious concedes that there appears to be a bone
18 fida financing transaction between Agrocorp and Indian Bank,
19 which are not related entities.
20   The transaction was conveniently entered into, not at
21 the time of the original purchase of the rapeseed, but at the
22 time the bill came due, with Agrocorp being, at that time, on
23 notice that a process of maritime attachment and garnishment
24 had issued against it and, no doubt, being well aware that in
25 this Circuit, under the Winter Storm decision, electronic fund

Page 26

1 transfers would be attachable under Rule B.
2     So, instead of paying the bill itself to Firebird,
3 Agrocorp went to Indian Bank and got Indian Bank to pay the
4 bill to Firebird. It was, of course, a debt of Agrocorp that
5 was paid, Indian Bank, having had no prior relationship with
6 Firebird or in connection with this transaction or other reason
7 to pay any money, let alone $600,000 to Firebird, Limited.
8     The question that confronts this Court is really which
9 of two district court decisions, by two eminent colleagues of
10 mine, to follow.
11     Judge Rakoff's decision in the -- I can't remember the
12 name of that case -- Prime Shipping Company case, 2006 US
13 District Lexus 34637, in which Judge Rakoff concluded that, "a
14 defendant, Wajilam Exports, did not have a financial interest
15 in a fund transfer that was made pursuant to an ordinary letter
16 of credit. That had been issued -- that had been purchased by
17 Bank Paribas, BNP, in order to finance the sale of logs,
18 certain items. Wajilam sells logs to buyers of Asia. And one
19 buyer obtained a negotiable letter of credit to purchase a
20 cargo of logs, and Paribas bought that letter of credit and had
21 presented it. And the funds were being transferred in response
22 to that presentation when they were netted by American Express
23 Bank here in New York. And Judge Rakoff concluded that because
24 of the nature of the letter of credit transaction, and the fact
25 that the fundamental principle of letters of credit is that the

Page 27

1 issuing bank's obligation to honor drafts drawn on a letter is
2 separate and independent from any obligation of its customer to
3 the beneficiary under the sale of goods contract and separate
4 as well from any obligation to issuer to its customer under
5 their agreement. He concluded that Paribas was entitled to the
6 money, and that the attachment would be vacated.
7     About three weeks ago, my equally eminent colleague
8 Judge Pauley, in a case that did not involve a letter of credit
9 but that involved one related corporation's paying the debt of
10 another related corporation, concluded that even though the
11 paying Corporation -- Judge Pauley in the SR International
12 Limited v. Mar Trade Gulf Logistics case, 2007 Westlaw 2456629
13 concluded that the property of Mar Log, a nonparty to the
14 action, could be attached under Rule B, because it was being
15 used to pay the debt of Mar Trade, an affiliated corporation.
16 And, indeed, everybody admitted to Judge Pauley that Mar
17 Log's -- the nonparty Mar Log's payment of an invoice issued
18 from Im Chait to Mar Trade was made not only for Mar Trade's
19 benefit, but that transfer had been orchestrated precisely to
20 avoid the attachment order. And Judge Pauley concluded that
21 this established that Mar Trade had a property interest in the
22 June 1st electronic funds transfer sufficient to render it
23 attachable under Rule B.
24     He did that in part on the authority of the Middle
25 District of Florida case, Linea Navira De Cabotaje v. Mar

Page 28

1 Caribe De Navegacion -- which I'll give to the court reporter
2 so she can spell it -- 169 F.Supp 2d. 1341 at 135960, which I
3 have taken a look at and in which a magistrate judge concluded
4 that the plaintiff had provided evidence that funds nominally
5 belonging to nonparties were, in fact, controlled by the
6 defendant on the basis inter alia that the funds were paid by
7 the nonparty at the party's specific direction, thereby
8 indicating the party, Mar Caribe's, abilities to control the
9 account of the nonparty.
10     One, I had never heard of trust receipts before today.
11 I have been educated on this ancient and venerable method of
12 financing which apparently is not much used, post uniform
13 commercial code in the United States, but there are places in
14 the world where there is no UCC and it is used and, apparently,
15 it can be used as an alternative to a letter of credit. I am,
16 however, convinced that the differences here are such that it
17 is Judge Pauley's decision, rather than Judge Rakoff's decision
18 that I ought to follow, particularly since the Aqua Stoli court
19 really made it quite clear that district courts are not to get
20 involved in and engaged in these intensive factfinding
21 proceedings, whereas, here, the parties have conceded the
22 procedural and the Rule B regularity of this particular
23 attachment for purposes of the vacatur motion.
24     Now, why do I come down in this particular way. As I
25 mentioned earlier, the financing for this particular purchase

Page 29

1 was arranged, significantly after the purchase, and shortly
2 after the time that this Court issued the maritime attachment
3 process.
4     Agrocorp, explicitly directed that Indian Bank pay the
5 amount of the invoice that was owed by Agrocorp to Firebird.
6 It was obviously done for benefit of Agrocorp. Indian Bank
7 takes the position that it was its money, not a loan, to its
8 client, Agrocorp, that was being used to pay these proceeds.
9     That, it seems to me, overlooks the nature of
10 nonletter of credit financing transactions and the realities of
11 those transactions. It was the intent of parties here, that
12 Agrocorp -- that Indian bank would take possession of, and it
13 may have been in position of the documents that would enable it
14 to present the letter of credit that had been issued by the
15 people who were buying the rapeseed from Agrocorp. To whatever
16 bank that had issued that letter of credit. I don't know what
17 bank did that letter of credit, I don't have a copy of that
18 letter of credit. But Indian bank, therefore, would be in a
19 position to present the letter of credit as Paribas presented
20 the letter of credit, and to collect the proceeds from the sale
21 of the Ukrainian rapeseed by Agrocorp to the third-party
22 purchaser. And then it was the intention, according to
23 counsel -- of course, I -- I believe him, because it makes
24 sense. It was the intention of Indian Bank to take possession
25 of the money from the letter of credit and, at that point, to

Page 30

1  repay itself for the money that it used to pay Firebird and
2  take out its fee and give the rest of the money, the rest of
3  the profit, to Agrocorp.
4      It is, therefore, not slight of hand. I don't want to
5  suggest that it is slight of hand. But it is not exactly
6  correct to say that Indian Bank was not advancing moneys, if
7  not directly to its client, then on behalf of its client. And,
8  for that reason, it is possible for this Court to find, as was
9  found in Linea Navira, and this summer by Judge Pauley in the
10 SR case, that the defendant in this case, Agrocorp, has an
11 interest in the funds, that were being EFT'd through New York
12 and that were netted by American Express Bank. Even though
13 those funds were being EFT'd by a third party, Indian Bank to a
14 third party, Firebird.
15     In so ruling, I am, as Judge Pauley was, defining the
16 word "property" under Rule B, broadly. The Second Circuit has
17 indicated that we district judges are to define the word
18 "property" broadly. I believe in the Winter Storm opinion,
19 Judge Haight, whom I know to be a biblical scholar an ardent
20 Episcopalian and former warden of his church, quoted a treatise
21 which said that the words were to be interpreted as broadly as
22 a phrase from the Nicene Creed, all things visible and
23 invisible.
24     And if one interprets the phrase, the word "property"
25 Under Rule B, as broadly as "all things visible and invisible,"

Page 31

1  I have a hard time seeing how it is that Agrocorp does not have
2  an interest in the money that Indian Bank was EFT'ing to pay
3  the invoice that Agrocorp owed for the rapeseed.
4      And I think that Indian Bank is, therefore, in a
5  significantly different position than Paribas was in the Prime
6  Shipping case, where Paribas had obtained title to a negotiable
7  letter of credit, appears to have been a sight letter, that was
8  issued by one party to a transaction in favor of the defendant
9  in the Prime Shipping case, and had presented the letter of
10 credit for payment. And there was really going to be a
11 disruption in the letter of credit process, payment process.
12     Whereas, here, the Indian Bank's position, I can't say
13 this 100 percent for sure because I have looked through these
14 documents at some length, but I'm -- I don't know if I'm
15 missing something. But Indian Bank appears to have acquired,
16 if I understood counsel correctly, the documents that would
17 allow it to present the letter of credit issued by Agrocorp's
18 seller for payment and get its money back. And the only person
19 who would appear to be out of pocket would be Agrocorp, which
20 is, after all, the party whose funds, whose property were being
21 attached by the Rule B maritime attachment.
22     So, for that reason, I am going to decline to vacate
23 the attachment, and I'm going to deny Indian Bank's application
24 to free up the money on the ground that the money actually
25 belongs to it.

Page 32

1      And I should say, that there is ample authority among
2  the judges of this Court for the proposition that money can't,
3  in fact, be the property of two or more people.
4      Judge Pauley certainly cited to that proposition.
5  It's been -- Judge Buchwald, in the HBC Hamburg Bulk Carriers
6  case articulated that proposition. And I have read that case.
7  And, yes, there undoubtedly are overlapping property rights as
8  between Indian Bank and Agrocorp in that $609,000. But
9  Agrocorp has enough of an interest in that property to make it
10 attachable and to warrant my denying the motion to vacate --
11 motions, I should say, to vacate the attachment.
12     So, there you have it. I am now rapidly becoming
13 acquainted with this emergent area of the law. I will be
14 interested to see how these things develop in the Second
15 Circuit, because this could quickly become the immigration
16 docket of the Second Circuit for the Southern District of New
17 York.
18     I think I have another one downstairs waiting to be
19 signed.
20     Okay. Very interesting. Very interesting.
21     MR. FOSTER: Thank you, your Honor.
22     MR. DUFFY: Thank you, your Honor.
23     THE COURT: Thank you, gentlemen.
24     (Adjourned)
25